UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------

POLICE BENEVOLENT ASSOCIATION OF
THE NEW YORK STATE TROOPERS, INC.,
LOUIS G. BARBARIA, JR., LARRY R. BRAUER,
ROBERT T. DILLON, JOHN F. FAY, THOMAS
FAYLE, ROBERT E. MAHON, JOHN J. NOONAN,
and PETER W. PERSON,

         Plaintiffs,

      v.              1:06-CV-767

WAYNE E. BENNETT, as Superintendent of
the New York State Division of State Police,
NEW YORK STATE EXECUTIVE DEPARTMENT,
NEW YORK STATE DIVISION OF STATE
POLICE, NEW YORK STATE AND LOCAL
RETIREMENT SYSTEM, and ALAN G. HEVESI,
as Comptroller of the State of New York,

         Defendants.
-------------------------------------

| APPEARANCES: | OF COUNSEL: |
|---|---|
| GLEASON, DUNN, WALSH, & O'SHEA<br>Attorneys for Plaintiffs<br>40 Beaver Street<br>Albany, New York 12207 | MARK T. WALSH, ESQ. |
| HON. ELIOT SPITZER<br>Attorney General of the State of New York<br>Attorneys for Defendants<br>The Capitol<br>Albany, New York 12224 | NELSON R. SHEINGOLD, ESQ. |

DAVID N. HURD
United States District Judge

## **MEMORANDUM-DECISION and ORDER**

### I. INTRODUCTION

Plaintiffs Louis G. Barbaria, Jr. ("Barbaria"), Larry R. Brauer ("Brauer"), Robert T. Dillon ("Dillon"), John F. Fay ("Fay"), Thomas Fayle ("Fayle"), Robert E. Mahon ("Mahon"), John J. Noonan ("Noonan"), Peter W. Person ("Person"), and their bargaining unit, the Police Benevolent Association of the New York State Troopers, Inc., (collectively "plaintiffs") bring this action against the New York State Division of State Police ("State Police"), the Superintendent of the State Police ("Superintendent"), the New York State Executive Department, the New York State and Local Retirement System, and the New York State Comptroller (collectively "defendants") pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-34, and the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution.

### II. FACTS

In 1969, the New York State ("State") Legislature passed a pension and retirement program for members of the Division of State Police ("State Police"), codified as Retirement and Social Security Law § 381-b. Subsection (e) of that law, which has been amended several times since its inception, reads as follows: "Mandatory Retirement. A member [of the State Police] subject to the provisions of this section shall be retired on December thirty-first of the year in which he attains fifty-seven years of age." N.Y. Retire. & Soc. Sec. Law § 381-b(e) (McKinney 2005).

In October 2001, in the wake of the 9/11 terrorist attacks, Governor George E. Pataki signed several executive orders temporarily suspending and modifying statutory

provisions related to the mandatory retirement of members of the State Police. Executive Order 113.36-A provided:

> I hereby temporarily suspend, for the period from the date of this Executive Order until further notice, the following laws: . . . Subdivision e of Section 381-b of the Retirement and Social Security Law, insofar as it requires a member of the Division of State Police who is in the twenty year retirement plan to retire on December thirty-first of the year in which the member attain[s] fifty-seven or sixty years of age; provided, however, that all decisions to retain a member of the Division of State Police after December thirty-first of the year in which the member attains fifty-seven or sixty years of age remain within the sole discretion of the Superintendent of the State Police, who must make a determination to retain such member based upon the following considerations: (1) the member is duly qualified, competent and physically fit for performance of the duties of the position in which the member is to continue to be employed; (2) there is need for the member's services in such positions; and (3) the member's continued employment is in the best interests of the government service.

Exec. Order No. 113.36-A, 9 N.Y.C.R.R. § 5.113.36-A (Oct. 16, 2001).

Plaintiffs allege that over 100 retirement-age members of the State Police were retained at the discretion of the Superintendent pursuant to Executive Order 113.36-A, and that as of June16, 2006, the date they filed the complaint, the State Police continued to employ persons over the age of fifty-seven.

Each individual plaintiff either was or is a member of the State Police and, pursuant to § 381-b(e), either was or will be forced to retire on December 31 of the year they attain[ed] fifty-seven years of age. Plaintiff Barbaria was mandatorily retired pursuant to § 381-b(e) on December 31, 2005. Plaintiff Noonan, in anticipation of his mandatory retirement date of December 31, 2006, retired some time prior to that date. All of the other individual plaintiffs will be mandatorily retired on December 31, 2007, or later. Each individual plaintiff previously filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and received a Notice of Right to Sue.

As mentioned above, plaintiffs bring this action under three separate theories of recovery.  <u>First</u>, plaintiffs claim that § 381-b(e) contravenes the ADEA's prohibition of age discrimination in employment.  While there is an exemption in the ADEA allowing for the application of mandatory retirement policies to firefighters and law enforcement officers, 29 U.S.C. § 623(j) ("§ 623(j)" or "the exemption"), plaintiffs argue that the exemption has no legal force.  Specifically, plaintiffs point out that under § 623(j)(1) employers seeking the exemption must comply with § 2(d)(2) of the ADEA Amendments of 1996 ("§ 2(d)(2)").  Section 2(d)(2) compels employers seeking the exemption to give retirement-age firefighters and law enforcement officers an opportunity to demonstrate their physical fitness by taking a test identified by the Federal Department of Health and Human Services ("HHS") as valid and nondiscriminatory.  Since HHS never issued regulations identifying such tests, making it impossible to comply with § 2(d)(2), plaintiff argue that the entire exemption has lost its legal force.  Alternatively, plaintiffs argue that even if the exemption has legal force, it does not apply here because they were not, or will not be, discharged pursuant to a "bona fide retirement plan" since Governor Pataki suspended § 381-b(e) by executive order.

<u>Second</u>, plaintiffs claim that defendants violated the Equal Protection Clause because their was no rational basis for their decision to retain similarly situated retirement-age members of the State Police while subjecting plaintiffs to mandatory retirement pursuant to § 381-b(e).

<u>Third</u>, plaintiffs claim that defendants violated the Due Process Clause because their decision to retain similarly situated retirement-age members of the State Police while subjecting plaintiffs to mandatory retirement pursuant to § 381-b(e) was irrational.

Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiffs oppose. Oral argument was heard via videoconference on November 29, 2006, in Utica and Albany, New York. Decision was reserved.

## III. DISCUSSION

### A. Rule 12(b)(6) Standard

On a Rule 12(b)(6) motion to dismiss, the allegations in the complaint are accepted as true and all reasonable inferences must be drawn in the plaintiff's favor. Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998); Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995). The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). A plaintiff's complaint will be dismissed for legal insufficiency only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957).

### B. ADEA Claim

Defendants move to dismiss plaintiffs' ADEA claim on the ground that § 381-b(e) is statutorily exempt from the ADEA under § 623(j).

#### 1. Law

As its title suggests, the ADEA prohibits age discrimination in employment. Specifically, the ADEA provides:

> It shall be unlawful for an employer—
>    (1)  to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

> (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or
>
> (3) to reduce the wage rate of any employee in order to comply with this chapter.

29 U.S.C.A. § 623(a) (1999).

However, the ADEA also sets forth certain exemptions, including one which allows state employers to establish mandatory retirement policies with respect to firefighters and law enforcement officers:

> It shall not be unlawful for an employer which is a State, a political subdivision of a State, an agency or instrumentality of a State or a political subdivision of a State, or an interstate agency to fail or refuse to hire or to discharge any individual because of such individual's age if such action is taken—
>
> (1) with respect to the employment of an individual as a firefighter or as a law enforcement officer, the employer has complied with section 3(d)(2) of the Age Discrimination in Employment Amendments of 1996 if the individual was discharged after the date described in such section, and the individual has attained—
>
> (A) the age of hiring or retirement, respectively, in effect under applicable State or local law on March 3, 1983; or
>
> (B)(i) if the individual was not hired, the age of hiring in effect on the date of such failure or refusal to hire under applicable State or local law enacted after September 30, 1996; or
>
> (ii) if applicable State or local law was enacted after September 30, 1996, and the individual was discharged, the higher of—
>
> (I) the age of retirement in effect on the date of such discharge under such law; and
>
> (II) age 55; and
>
> (2) pursuant to a bona fide hiring or retirement plan that is not subterfuge to evade the purposes of this chapter.

29 U.S.C.A. § 623(j) (Supp. 2006).  The text of § 623(j) indicates that compliance with § 2(d)(2) of the 1996 amendments[1] is a precondition of the exemption if the firefighter or officer was discharged after the date described in that section.

Section 2(a) & (c) of the 1996 amendments gave HHS three years to conduct a study on and develop and issue advisory guidelines for "the administration and use of physical and mental fitness tests to measure ability and competency of law enforcement officers and firefighters to perform the requirements of the jobs of the officers and firefighters."  Pub. L. 104-208, § 119(2)(d)(2), 110 Stat. 3009, 3009-24–3009-25 (1996). Section 2(d)(1) provides that "[a]fter issuance of the advisory guidelines . . . the Secretary [of HHS] shall issue regulations identifying valid, nondiscriminatory job performance tests that shall be used by employers seeking the exemption described in [§ 623(j)]."  Id. at 3009-25. Finally, § 2(d)(2) provides:

> Effective on the date of issuance of the regulations described in paragraph (1), any employer seeking such exemption with respect to a firefighter or law enforcement officer who has attained such age shall provide to each firefighter or law enforcement officer who has attained such age an annual opportunity to demonstrate physical and mental fitness by passing a test described in paragraph (1), in order to continue employment.

Id.  HHS never issued the regulations described in § 2(d)(1) of the 1996 amendments.

**2. Analysis**

As stated above, defendants' move to dismiss plaintiffs' ADEA claim on grounds that § 381-b is statutorily exempt from the ADEA under § 623(j).  Specifically, defendants

---

[1] While § 623(j) refers to "section 3(d)(2) of the Age Discrimination in Employment Amendments of 1996," according to the Historical and Statutory Notes to § 623, this "probably means" § 2(d)(2) of the 1996 amendments, or Pub. L. 104-208, § 119(2)(d)(2), 110 Stat. 3009 (1996).  29 U.S.C.A. § 623 (Historical and Statutory Notes; References in Text); see also Drnek v. City of Chicago, 192 F. Supp. 2d 835, 838 (N.D. Ill. 2002) (discussing apparent typographical error).

argue that § 381-b is statutorily exempt under § 623(j) because (1) Congress intended that the exemption have legal force in the event that HHS failed to issue the regulations identifying legitimate, nondiscriminatory job performance tests; and (2) Executive Order 113.36-A is no longer in effect, making § 381-b(e) a bona fide retirement plan under the exemption.

### a. Legal Force of § 623(j)

The question whether Congress intended that the exemption have legal force in the event that HHS failed to issue the regulations is, quite obviously, a question of congressional intent. The single most important clue in deciphering congressional intent is the statutory language itself. See Green v. City of New York, 465 F.3d 65, 78 (2d Cir. 2006); Gottlieb v. Carnival Corp., 436 F.3d 335, 337 (2d Cir. 2006). When the statutory language is clear and unambiguous, it is presumed that Congress intended that it be given its plain meaning. See Green, 465 F.3d at 78; Gottlieb, 436 F.3d at 337. When ambiguous statutory language renders the plain-meaning approach useless, the canons of statutory interpretation may be employed. See Green, 465 F.3d at 78; Gottlieb, 436 F.3d at 337. However, it is only when both of these approaches fail that courts resort to legislative history. See Green, 465 F.3d at 78; Gottlieb, 436 F.3d at 338.

Turning first to the statutory language itself, neither § 623(j) nor § 2(d)(2) explicitly contemplate what effect, if any, HHS's failure to issue the regulations would have on the legal force of the exemption. Nor do they provide any other helpful textual clues. While none of the canons of statutory interpretation apply, common sense suggests that Congress's failure to address this contingency means that it intended for the exemption to have legal force even if HHS failed to issue the regulations. In other words, if Congress intended that

the exemption lose its legal force in the event that HHS failed to issue the regulations, it would have so provided in explicit terms.

However, when one considers that HHS's failure to issue the regulations has effectively thwarted the primary purpose of the 1996 amendments – to afford retirement-age firefighters and law enforcement officers an opportunity to avoid mandatory retirement by demonstrating their physical and mental fitness – it seems unlikely that Congress intended that the exemption survive such a contingency.  Put another way, despite the fact that Congress did not expressly communicate its intention that the exemption lose its legal force in the event that HHS failed to issue the regulations, HHS's failure to do so has so fundamentally altered § 623(j) that this intent may be inferred.

Therefore, based on the statutory language (or lack thereof) two reasonable but conflicting interpretations of § 623(j) have emerged and consideration of legislative history to determine the correct interpretation is proper.

In 1986, Congress, recognizing that public safety concerns sometimes outweigh our desire to eliminate age discrimination in employment, amended the ADEA to include the exemption at § 623(j) (originally § 623 (i)).  See Pub. L. 99-592, §§ 3 & 4, 100 Stat. 3342 (1986).  However, Congress also recognized that allowing mandatory retirement age policies would necessarily lead to the mandatory retirement of firefighters and law enforcement officers who, despite their age, remained perfectly capable of performing their jobs. Therefore, Congress directed the EEOC to conduct a study and propose guidelines concerning the feasibility of fitness examinations by which retirement-age firefighters and law enforcement officers could demonstrate fitness and thereby avoid mandatory retirement. EEOC conducted a study but never proposed guidelines.  The exemption remained in force

until 1993, when it terminated pursuant to a sunset provision included in the 1986 amendments. In 1996 Congress repealed the sunset provision in the 1986 amendments thereby reinstating the exemption. See Pub. L. 104-208, § 119(1)(a), 110 Stat. 3009, 3009-23 (1996). Notably, Congress did not include a sunset provision. Like in 1986, Congress enlisted a federal agency, this time HHS, to conduct a study and issue guidelines on the use of job performance tests to determine the fitness of retirement-age firefighters and law enforcement officers. In addition, Congress directed HHS to issue regulations identifying particular job performance tests to be used by employers seeking the exemption.

The events and circumstances surrounding the inception of the exemption in 1986, as well as its reinstatement in 1996, help clarify the issues in this case. First, in 1986 Congress directed EEOC to conduct a study and propose guidelines within five years. While EEOC produced a study, it never proposed guidelines. However, there is no indication that Congress intended that the exemption lose its legal force if EEOC failed to propose guidelines, or that the exemption actually lost its legal force when the five-year period expired in 1991. In fact, the exemption terminated approximately two years later pursuant to the sunset provision, not EEOC's failure to propose guidelines. Morever, Congress's decision not to include a sunset provision in the reinstated version of the exemption indicates that it intended that the exemption be permanent. Further, in light of EEOC's previous failure to propose guidelines within five years, Congress's decision not to include a sunset provision or other emasculating language indicates that it intended that the exemption have legal force regardless of whether HHS heeded its direction to issue the regulations.

Finally, the floor debates on the 1996 amendments in the House of Representatives and the Senate support this conclusion. See Drnek v. City of Chicago, 192 F. Supp. 2d 835,

840-42 (N.D. Ill. 2002) (discussing floor debates at length).  For example, Representative Harris W. Fawell (R-Ill.), the sponsor of the 1996 amendments, stated the following during a floor debate:

> [T]he bill we are considering today directs the Equal Employment Opportunity Commission [later changed to HHS] to develop and to issue advisory guidelines for the administration and use of physical and mental fitness tests to measure the ability and competency of law enforcement officers and firefighters to perform the requirements of their jobs.  <u>Until the point that adequate tests are in place however, I feel that the public safety exemption to the ADEA is necessary and that [the 1996 amendments] should be quickly enacted.</u>  I urge the support of the legislation.

141 Cong. Rec. H3822-01 (daily ed. Mar. 28, 1995), 1995 WL 131679 (emphasis added).

Moreover, Senator Carol Moseley-Braun (D-Ill.), who introduced the 1996 amendments in the Senate, pointed out during floor debates that the 1996 amendments directed HHS to conduct a study, and issue guidelines and regulations on fitness tests.  <u>See</u> 142 Cong. Rec. S11922-01 (daily ed. Sept. 30, 1996), 1996 WL 553838.  However, she acknowledged EEOC's previous failure to propose guidelines and was generally skeptical of the effectiveness of such fitness tests.  <u>See</u> 141 Cong. Rec. S3891-02 (daily ed. Mar. 14, 1995), 1995 WL 105762 ("there is no adequate test that can simulate the conditions that firefighters and police officers face in the line of duty").  In addition, the tenor of Senator Moseley-Braun's statements make clear that the primary purpose of the 1996 amendments was to reinstate the exemption to ensure public safety, not to provide able retirement-age firefighters and law enforcement officers with a means to avoid mandatory retirement.  <u>See id</u>.

Therefore, Congress intended that the exemption have legal force in the event that HHS failed to issue the regulations identifying legitimate, nondiscriminatory job performance tests.

### b. Effect of Executive Orders

The second assumption upon which defendants rely is that Executive Order 113.36-A is no longer in effect, making § 381-b(e) a bona fide retirement plan under the exemption.

The Governor of the State of New York has the power to temporarily suspend by executive order specific provisions of any law during a state disaster emergency to cope with the disaster. N.Y. Exec. Law § 29-a(1) (McKinney 2002). However, "no suspension shall be made for a period in excess of thirty days, provided, however, that . . . the governor may extend the suspension for additional periods not to exceed thirty days each." Id. at § 29-a(2)(a). Thus, an executive order that temporarily suspends a law during a disaster emergency must be renewed by the governor every thirty days to remain in effect.

In this case, shortly after the 9/11 terrorist attacks, Governor Pataki signed Executive Order 113.36-A, temporarily suspending § 381-b(e). Thereafter, he renewed that Order every thirty days up until June 11, 2006. See 9 N.Y.C.R.R. §§ 5.113.42–43-A, 46, 48–61, 63–64, 66–72, 74–76, 78–80, 82, 84, 86, 88, 90–98, 101, 103, 105, 107–115 (Nov. 7, 2001–June 13, 2006). Since Governor Pataki did not renew the Executive Order 113.36-A after that date, it expired on July 11, 2006. See 9 N.Y.C.R.R. § 5.113.116 (July 18, 2006).

Therefore, Executive Order 113.36-A is no longer in effect, making § 381-b(e) a bona fide retirement plan under the exemption.

### c. <u>Application</u>

Having determined that § 623(j) has legal force and § 381-b(e) is a bona fide retirement plan under the exemption, applying the law to this case is a rather straightforward exercise. The clear and unambiguous language of § 623(j) indicates that employers seeking the exemption must comply with § 2(d)(2) only "if the individual was discharged after the date described in such section." Section 2(d)(2) does not describe a specific date, rather it refers to the "date of issuance of the regulations described in paragraph (1)" – the regulations identifying valid, nondiscriminatory job performance tests. However, for reasons unknown, HHS never issued the regulations. Thus, those plaintiffs who have already been mandatorily retired could not have been retired after the date described in § 2(d)(2); and if HHS does not issue the regulations before December 31 of the years the other plaintiffs reach fifty-seven years of age, those plaintiffs also cannot be discharged after the date described in § 2(d)(2). Thus, defendants were not (and will not be until the regulations are issued) required to comply with § 2(d)(2) to avail themselves of the exemption.

Therefore, defendants' motion to dismiss plaintiffs' ADEA claim will be granted.

### C. <u>Equal Protection Claim</u>

Defendants move to dismiss plaintiffs' equal protection claim on the ground that plaintiffs have not alleged an identifiable or suspect class and, even if they had, they cannot show that their mandatory retirement was not or will not be rationally related to the furtherance of a legitimate state interest.

The Fourteenth Amendment provides, in relevant part, that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Many of the claims brought pursuant to the Equal Protection Clause are brought by

persons alleging discrimination based on their membership in a protected class. However, the Equal Protection Clause also allows for "class of one" claims whereby a single plaintiff can bring a claim alleging that the government has "intentionally treated [him] differently from others similarly situated and that there is no rational basis for the difference in treatment." Vill. of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S. Ct. 1073, 1074 (2000). A plaintiff has sufficiently alleged that there is no rational basis for the difference in treatment if he has alleged as much in the complaint; in other words, a set of detailed factual allegations describing why the difference in treatment was irrational is not necessary. See Olech, 528 U.S. at 565, 120 S. Ct. at 1075 (mere allegation that treatment was "irrational and wholly arbitrary" sufficient to allege that no rational basis for difference in treatment); DeMuria v. Hawkes, 328 F.3d 704, 707 (2d Cir. 2003) (allegation that defendants acted "maliciously and arbitrarily because they were involved in a dispute with [plaintiff's] friend" sufficient to allege no rational basis for different treatment).

In this case, plaintiffs allege that defendants' decision to retain some retirement-age members of the State Police pursuant to Executive Order 113.36-A, while applying § 381-b(e) to them was not or will not be rationally related to the furtherance of a legitimate state interest. Plaintiff's do not allege, as defendants suggest, that § 381-b(e) violates the Equal Protection Clause because it treats similarly situated members of the State Police differently based on age. Thus, plaintiff's equal protection claim is not barred under Massachusetts Board of Retirement v. Murgia, 427 U.S. 307, 96 S. Ct. 2562 (1976).[2] Thus, plaintiffs' are

---

[2] In Murgia, the United Stated Supreme Court held that a Massachusetts statute setting a mandatory retirement age of fifty for state law enforcement officers did not violate the Equal Protection Clause because it was rationally related to the legitimate state interest of public safety. In that case, the plaintiff, who was over fifty years of age, argued that he was treated differently than similarly situated
(continued...)

"class of one" equal protection claims. Moreover, plaintiffs have sufficiently stated their claims because they have alleged that defendants intentionally and irrationally treated them differently from others similarly situated. However, if those similarly situated persons – the retirement-age members of the State Police retained pursuant to Executive Order 113.36-A – were mandatorily retired upon the expiration of that Order, as they should have been, only plaintiff Barbaria has stated a "class of one" equal protection claim.[3] This is because Barbaria was mandatorily retired on December 31, 2005, several months before the expiration of Executive Order 113.36-A, and thus actually would have been subjected to treatment different from others similarly situated. If the retained members of the State Police were indeed mandatorily retired at or about the time Executive Order 113.36-A expired, the other plaintiffs, many of whom have not yet reached mandatory retirement-age, have not and cannot allege treatment different from others similarly situated.

Therefore, at this stage, defendants' motion to dismiss plaintiffs' equal protection claims will be denied.

### D. Due Process Claim

Defendants move to dismiss plaintiffs' due process claim on the grounds that plaintiffs have failed to allege the existence and infringement of a valid liberty or property interest and conduct that is so outrageously arbitrary as to constitute gross abuse of

---

[2](...continued)
persons because of his age. As stated above, that is not what plaintiffs argue in this case.

[3] Defendants have submitted a declaration by Martin T. Probst, the State Police Director of Personnel, indicating that all retirement-age members of the State Police retained pursuant to Executive Order 113.36-A were mandatorily retired as of June 28, 2006. Probst Decl. 1. However, on a Rule 12(b)(6) motion to dismiss, court's are generally not permitted to consider matters outside the pleadings unless the motion is converted to a Rule 56(c) motion for summary judgment and the parties are given an opportunity to present all pertinent evidence. Fed. R. Civ. P. 12(b). Since this motion will not be converted to a Rule 56(c) motion, the Probst declaration will not be considered at this stage.

governmental authority. Defendants also move to dismiss on the ground that plaintiffs' substantive due process claim is superfluous.

The Fourteenth Amendment provides, in relevant part, that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. From this provision arises two separate constitutional doctrines: procedural due process and substantive due process. The fundamental requirement of procedural due process is "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Mathews v. Eldridge, 424 U.S. 319, 333, 96 S. Ct. 893, 902 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552, 85 S. Ct. 1187, 1191 (1965)). However, the first step in a procedural due process analysis is to determine whether the plaintiff was deprived of a protected interest. "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709 (1972).

In this case, § 381-b(e) provides that members of the State Police be mandatorily retired on December 31 of the year in which they attain fifty-seven years of age. See § 381-b(e). Upon mandatory retirement, a member of the State Police loses all claims of entitlement to future employment or eligibility for future employment that he may have had. Executive Order 113.36-A, by its terms, gave discretionary authority to the Superintendent to select which retirement-age members of the State Police would be retained, if any, and which members would remain subject to mandatory retirement. Notably, the retained members of the State Police were not entitled to the benefits and privileges bestowed on permanent

members. See 9 N.Y.C.R.R. § 469.5. That Executive Order 113.36-A limited the Superintendent's discretionary authority by providing criteria to be considered in deciding which members of the State Police would be retained is of no consequence. Executive Order 113.36-A does not require that all retirement-age members of the State Police who fall within the qualification, competence, and fitness criteria be retained. Rather, it provides that all retention decision are within the sole discretion of the Superintendent. Thus, plaintiffs did not hold a protected liberty or property interest.

Moreover, even if plaintiffs held a protected liberty or property interest, it is unlikely that they would have been entitled to a hearing. The burden to the State in conducting hearings for each and every member of the State Police who was not retained under Executive Order 113.36-A would likely outweigh plaintiffs' interests in being heard. See Johnson v. Lefkowitz, 566 F.2d 866, 869 (2d Cir. 1977).[4]

Thus, plaintiffs have not stated a procedural due process claim.

The doctrine of substantive due process protects against government conduct that deprives people of protected rights and truly "shocks the conscience" of the court, County of Sacramento v. Lewis, 523 U.S. 833, 834, 118 S. Ct. 1708, 1710 (1998) (citing Rochin v. California, 342 U.S. 165, 172-73, 72 S. Ct. 205, 209-10 (1952)), or is "so outrageously arbitrary as to constitute a gross abuse of governmental authority," Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999); see also Lewis, 523 U.S. at 846, 118 S. Ct. at

---

[4] Plaintiffs allege that more than 100 members of the State Police were retained under Executive Order 113.36-A. According to the State Police website, there are over 4,600 sworn and 1,000 non-sworn members of the State Police. See New York State Division of State Police, Employment: Trooper Employment, http://www.troopers.state.ny.us/Employment/Trooper_Employment/ (last visited Mar. 13, 2007). While it is unknown exactly how many members were mandatorily retired between October 2001 and July 2006, it is probably a significant number.

- 17 -

1716 (substantive due process only protects against "the most egregious official conduct"). However, "[w]here a particular constitutional amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" Albright v. Oliver, 510 U.S. 266, 273, 114 S. Ct. 807, 813 (1994) (quoting Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871 (1989)); see Bryant v. City of New York, 404 F.3d 128, 135-36 (2d Cir. 2005).

In this case, plaintiffs bring an equal protection claim against defendants. As discussed above, defendants' motion to dismiss that claim will not be granted. Moreover, the government conduct of which plaintiffs complain, with respect to both the equal protection and due process claims, is defendants' decision to retain some retirement-age members of the State Police while subjecting plaintiffs to mandatory retirement. In other words, plaintiffs' constitutional grievance is that they were or will be "intentionally treated differently from others similarly situated and that there [was or] is no rational basis for the difference in treatment." Olech, 528 U.S. at 564, 120 S. Ct. at 1074. Since the Equal Protection Clause provides an explicit textual source of constitutional protection against such conduct and plaintiffs bring a claim under it, plaintiffs' substantive due process claim is superfluous.

Therefore, defendants' motion to dismiss plaintiffs' due process claim will be granted.

## IV. CONCLUSION

For the reasons discussed above, defendants' motion to dismiss plaintiffs' ADEA claim will be granted because the exemption at 29 U.S.C. § 623(j) has legal force and applies in this case. Defendants' motion to dismiss plaintiffs' equal protection claim will be denied

because based on the pleadings plaintiffs have sufficiently stated such a claim. However, defendants' motion to dismiss plaintiffs' due process claim will be granted because plaintiffs have failed to allege a protected interest and their substantive due process claim is superfluous.

Accordingly, it is

ORDERED that:

1. Defendants' motion to dismiss is GRANTED in part and DENIED in part;

2. Defendants' motion to dismiss plaintiffs' ADEA and due process claims (first, second, third, and fifth causes of action) is GRANTED and those claims are DISMISSED;

3. Defendants' motion to dismiss plaintiffs' equal protection claim (fourth and sixth causes of action) is DENIED; and

4. Defendants are directed to file and serve an answer to the fourth and sixth causes of action on or before April 6, 2007.

IT IS SO ORDERED.

_____
United States District Judge

Dated: March 16, 2007
       Utica, New York.